FEE PAID

FILED
CLERK, U.S. DISTRICT COURT

JAN 23 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

1  Julian Brew (SBN 150615)
   julian@cypressllp.com
2  **CYPRESS LLP**
3  11111 Santa Monica Blvd., Ste. 500
   Los Angeles, CA 90025
4  Telephone: (424) 901-0123
   Facsimile: (424) 750-5100
5

6  Attorneys for Plaintiff
7  RELATOR LLC

8

9              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
10

11 **UNITED STATES OF AMERICA,**          Case No. **2:23-CV-00495-SVW-PDx**
12
           Plaintiff,
13
14 *ex rel.* **RELATOR LLC**, a California    **COMPLAINT FOR VIOLATIONS**
   Limited liability company,              **OF FEDERAL FALSE CLAIMS**
15                                          **ACT**
           Relator,
16
                                           **FILED *IN CAMERA* UNDER SEAL**
17     v.                                  **PURSUANT TO 31 U.S.C. §**
                                           **3730(b)(2)**
18 **CHANGE LENDING, LLC**, dba
19 Change Home Mortgage, a California      **DO NOT PLACE ON PACER**
   limited liability company, **DAN**
20 **ADAMS**, an individual, **SCOTT**
   **SIMONICH,** an individual, **THE**     **JURY TRIAL DEMANDED**
21 **CAPTAL CORPORATION**, a South
   Carolina corporation, **COMMERCE**
22 **HOME MORTGAGE LLC,** a
23 California limited liability company; and
   DOES 1-10,
24
25         Defendants.
26
27
28

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

COMPLAINT

Plaintiff RELATOR LLC (hereinafter referred to as "Plaintiff") complains of **CHANGE LENDING, LLC**, dba Change Home Mortgage, a California limited liability company, **DAN ADAMS**, an individual, **SCOTT SIMONICH,** an individual, **THE CAPTAL CORPORATION**, a South Carolina corporation, **COMMERCE HOME MORTGAGE LLC,** a California limited liability company, and DOES 1-10,

## I.    SUBJECT MATTER JURISDICTION

1.    This Court has subject matter jurisdiction over the Plaintiff's claims brought under the False Claims Act, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

## II.    INTRODUCTION: FRAUD BY CORPORATIONS

2.    **Rogue Corporations**. While some who defrauded government aid programs during the Pandemic were lone individuals, some were CEO's using the capabilities of their corporations to commit fraud with devastating effectiveness. While most companies did not try to dishonestly take advantage of aid programs, some overly aggressive executives saw an opportunity for "free money" for their companies and decided to loot the public purse. Some corporations, such as these in this case, falsely confirmed that their *business type* did not disqualify them for financial assistance, when it did. Or, they blatantly lied about the economic uncertainty making the loan necessary to pay payroll costs, when the companies were actually making record profits. Other companies lied about their unnamed affiliates, which also made them ineligible for the loans. Here the defendants deceived the government about all these things, and more.

3.    **The Increased Danger with Corporate Fraud**. Most corporations did not abuse the aid programs. Even those that may have skirted the rules some, did not act egregiously. However, some corporations and their executives did in fact make the conscious decision to embezzle money from aid programs. These

executives actively engaged in a sustained effort to obtain ill-gotten aid loans, meant for struggling businesses. This case is one example. As opposed to the lone fraudster or small band of criminals, when a corporation directs its considerable resources towards fraud it does so with great effectiveness. This heightened capacity to defraud poses unique problems to the taxpayer and law enforcement. As in the present case, corporate fraud is perpetrated with a higher level of sophistication, and with the combined effort of many hands working in the corporation, some unwittingly. The corporate scammer is veiled with a cover of propriety that comes with being an established business. Corporate actors often have the benefit of legal assistance which, if it cannot dissuade the dishonest conduct, can at least assist in the defense of it. Corporate bad actors often have ample financial means to help drive efforts to obtain prohibited funds, conceal crimes and then oppose legal efforts by law enforcement to identify and rectify the malfeasance.

4.     **Falsification of Economic Need**. What all Paycheck Protection Program fraudsters have in common is payroll costs which they say they cannot afford.  Some created fake businesses. Some created fake personnel. However some, like the Defendants, falsely certified to the government they have "economic uncertainty" so detrimental that they were unsure they could afford payroll costs. They lied about needing the money. They also falsified their industry type eligibility. Some industries are prohibited from aid by the SBA. However, some companies lied when they certified their eligibility. All these types of scammer falsified claims in material ways. In big ways. In this case, in many big ways.

5.     **CEO, Board and Investor Bad Conduct**. While most corporations have acted responsibly, or at least not illegally, a number of corporations have flagrantly crossed the line. The Defendants in this case are an example. These corporations have been directed to provide many false statements to the government. The statements were material. They were numerous. The false claims

were made in a continuing effort lasting many months. They were intended to obtain a loan which was prohibited. This may be the result of willful indifference, but more often, as in this case, it is the result of premeditated and deliberate action, which manifests in a concerted campaign of dishonesty, which was successful. This scheme to defraud the US taxpayer was no accident. Nor was it the result of an innocent mistake in law or accounting. These concerted efforts were the result of greedy CEOs, overly aggressive executives, and done under the auspices of investors who looked the other way while enjoying a windfall. Whatever the origin, the roads all led to embezzlement.

6.    While millions of struggling Americans lost their jobs and small businesses shuttered their doors, some unscrupulous corporate raiders robbed aid programs which were supposed to help those struggling Americans. This is one of those cases.

### III.    FRAUD SCHEME SUMMARY

7.    In this matter a highly profitable <u>investment banking</u> company called The Capital Corporation used one of its subsidiaries, <u>a mortgage lender</u>, to obtain a large loan from the PPP (Paycheck Protection Program, hereinafter "PPP"), falsely certifying both its *industry eligibility* and *economic uncertainty* so that it could qualify for a loan to pay its workers. It is inconvincible that these Defendants were concerned about having enough money on hand to pay their workers. In 2020, the year it applied for the loan, it raised an astonishing $50 million in equity from investors, and made more than $7 billion in loans to 30,000 borrowers itself, yet it falsely claimed it <u>needed</u> US taxpayer money to pay its 250 employees.[1] The payroll costs it received were also beyond allowable limits, breaking the salary cap rules per employee. Defendants took money they did not need and were not allowed

---

[1] The $50,000,000 raised by the Defendant mortgage company and its hundreds of millions in 2020 revenues are not the only income accumulated by the Defendant mortgage company. The parent company, The Capital Corporation, was also accumulating tens of millions of dollars of income in 2020 alone, which should have been more than enough to pay their workers.

to receive, and they took amounts for expenses which were not authorized. They stole from the US taxpayer in almost every way possible.

8.    Defendant embezzled **$7,945,500.00** from the government's PPP. Defendants falsely made the representations, authorizations and certifications that: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" which is the language prominently displayed on the government's loan application. The Defendant's also falsely claimed that their industry does not disqualify them from obtaining the loan. They are disqualified. Lenders and investment bankers are prohibited from taking a PPP loan. The Defendant claimed revenue loss, despite making hundreds of millions in profits and raising tens of millions in investment capital in 2020. Defendant far exceeded the allowable payroll costs.

9.    **No Economic Need, Objectively or Subjectively**. The aid money was not necessary. However, what makes this matter especially egregious is that the Defendants <u>knew</u> the loan was not necessary. Even if there was economic uncertainly, it is impossible that the Defendant's thought there was enough uncertainly so as to prevent them from paying their workers. No reasonable person could believe that the hundreds of millions in profits and capital investments could not cover the salaries for 250 people. They did not have uncertainty: Defendants were awash in profits from a lucrative business enjoying industry wide boom, and new capital from investors.

## IV.    FALSE CLAIMS

10.    Defendants raided the public purse, using the PPP as a free-for-all to horde resources meant for others. The CEO's and executives at the Defendants' companies acted purposefully and dishonestly to capitalize on what they saw as an opportunity to cash in for their companies. Both investment banking companies and mortgage lenders are specifically restricted by the SBA. Neither company is allowed take a loan based on their industry. Both companies are prohibited. Apart

C Y P R E S S   L L P
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

1  from industry prohibition, there was also no economic need for the loan.

2  Defendants' mortgage business was highly profitable when they took the loan.[2]

3  During 2020-2021, Defendants made *billions* of dollars in loans to others and made

4  hundreds of millions of dollars in annual revenue, yet they claimed it was necessary

5  to take **$7,945,500.00** from the US taxpayers, purportedly to pay their own workers.

6  It is unconscionable. Defendants did not need any financial assistance from the US

7  taxpayer. They simply abused the PPP and used it as a profiteering opportunity.

8  They then falsified subsequent documents which were presented to the government

9  to obtain loan forgiveness, billing millions to the US taxpayer and draining the

10  program of aid funds. Now that program is running dry.

11      11.   Dan Adams (hereinafter "ADAMS") directed his mortgage lending

12  business, Commerce Home Mortgage, LLC (hereinafter "COMMERCE") to

13  receive a PPP loan for a total of **$7,945,500.00**, purportedly to cover payroll costs,

14  however they:

15          a.  Falsified their industry eligibility ;

16          b.  Falsified the economic need for the loan;

17          c.  Falsified uncertainty about being able to pay their payroll;

18          d.  Falsified allowable payroll costs;

19          e.  Falsified affiliation with its parent company;

20          f.  Falsified the use of the loans on authorized expenses; and

21          g.  Falsified eligibility for loan forgiveness.

22      COMMERCE is prohibited from taking a loan, and so is its parent company

23  The Capital Corporation, which is an investment bank.  On November 13, 2017,

24  The Capital Corps, LLC (aka The Capital Corporation) acquired COMMERCE.

25  They are affiliated and the SBA's applications require COMMERCE to report its

26  _____

27  [2] The Defendant's company is reported to have between $257,000,000 and $500,000,000
in yearly revenue. Defendant is also reported to have made $7 billion in loans in 2020, the
year they applied for the PPP loan. That same year, Defendant also raised $50,000,000 in
28  capital raised from investors. Yet, Defendants went to the government, claiming they were
uncertain they could pay their 250 employees.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

affiliation with its various affiliate companies. In 2021, COMMERCE changed its name to Change Home Mortgage.

12.   Misappropriation. The PPP is and always was intended to help struggling small businesses. It was not an invitation to the mega rich who did not need a loan to drain "free money" out of the US economy. Many Americans lost their jobs during the pandemic and many small businesses closed; some of these because the PPP aid money which could have saved them ran out. Many people are still losing their jobs. Part of the reason is because of those like the Defendants, who bilked the PPP for millions of dollars in aid funds. Simply put, Defendants marauded the PPP, breaking the rules to get as much money as they could, maximizing their embezzlement. It was embezzlement for many reasons: Defendant's industry type restricted them: Lenders and investment banks are not allowed to take PPP money. They also did not need the money. They were not allowed to lie about whether the money was used on authorized expenses. They used the money on unauthorized expenses, even on paper. They received loan money for amounts beyond the salary caps made clear by the SBA. As an added act of corporate greed and misappropriation, they obtained total loan forgiveness, billing millions of dollars to the US taxpayers.

13.   Restriction Prohibiting Lenders. COMMERCE and ADAMS applied for and received the large PPP loan despite knowing they were absolutely *not allowed*. They are in the direct money lending business and therefore *ineligible* to receive PPP loans.[3] While the vast majority of American industries are allowed to take PPP loans, a very few select industries are specifically not allowed, such as money lenders like Defendants. The rationale for this restriction is that money lenders have money readily available to cover their own payroll. This is not to mention that mortgage lenders were not financially suffering like other business

---

[3] After receiving the loan COMMERCE did not return the money, but rather obtained loan forgiveness, foisting the cost onto the American taxpayer.

types were, especially in 2020. It would not be just or necessary to provide large loans to companies like these. The government's rules reflected this. There were other reasons for the restrictions as well.

14.    <u>No Economic Necessity and Mortgage-Backed-Securities (MBS)</u>. The SBA rules explaining the purpose of the loan are clear: to help struggling businesses pay their workers. ADAMS and his business, all under the Capital Corporation ("CAPITAL") umbrella were highly profitable when they took the loans in 2020. They were also highly profitable in 2021 when they asked for loan forgiveness. Business was not suffering. COMMERCE is currently rumored to have upwards of $257,000,000 in annual revenue. Some have reported their revenue as high as $500,000,000 annually. To achieve this current level of revenue, COMMERCE would have to have been awash in money in 2020 so they could make the billions of dollars in loans it is now reaping interest income from. At the time of the loans COMMERCE had tens of millions if not billions of dollars in capital, yet Defendants falsely certified they had "economic uncertainty", so they could take money from the US taxpayer. They did not need the money. Defendants took advantage of the opportunity.

15.    *Economic uncertainty* must exist to be eligible for this PPP loan. This uncertainty must <u>at the very least</u> exist in the mind of borrower. There could not have been economic uncertainly for these Defendants, even subjectively. Beyond any reasonable doubt, the executives in these companies must have known they had more than enough money to pay their 250 employees. There was no decline in revenue in 2020 or 2021. Quite the opposite: Defendants were enjoying high profits during an unprecedented boom in their industry. There was no "need" or "economic necessity" to pay Defendant's payroll expenses.[4] No reasonable person could have

---

[4] COMMERCE did not need the loans. They took advantage. COMMERCE is not a small business in dire financial straits, but rather a well-financed finance company which was enjoying higher profits. Public information shows their revenue was not declining, and their own statements indicate massive growth and profits. Defendant cannot show "economic necessity" in needing the loans to continue business operations.

COMPLAINT

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

had uncertainty in their mind. COMMERCE had a banner year. They also raised money in the amount of $50,000,000 to expand their business. This is not only because housing prices and purchases have dramatically increased since 2020 and continue to increase, but also because of the Federal government's policy to purchase Mortgage-Backed-Securities (MBS) which provided mortgage lenders like Defendant a steady source of high income.[5]  Defendant did not suffer any economic downturn. Defendants enjoyed a major increase in revenue in 2020, 2021 and continues to grow in 2022, thanks to US taxpayer subsidies. Defendants did not need the loan. COMMERCE had a very lucrative year and so did ADAMS. COMMERCE offices remained open and business was actively continuing and increasing in volume and profitability. It was a very lucrative year for COMMERCE and its owners. They had absolutely no need for a PPP loan, let alone for millions. They took advantage of the PPP program and used it as a windfall.

16.    <u>Unauthorized Expenses</u>. PPP funds must only be used on authorized expenses. PPP funds are:

NOT authorized for lenders or banks,

NOT authorized for investment banks,

NOT authorized for a business which has no economic need for the loan;

NOT authorized for payroll costs of in excess of $100,000; and

NOT authorized for businesses or individuals who fraudulently submit

applications and supporting documents.

COMMERCE, CAPITAL and their CEOs broke all these rules.

17.    <u>Direct Lending</u>. COMMERCE was <u>ineligible</u> to receive any SBA loans whatsoever. They are not merely "a real estate credit" company as they

---

[5] Agency MBS purchases are issued by the Federal government. The US Federal Reserve has a $1.25 trillion program to purchase mortgages which was restarted on March 15. 2020 as a result of the COVID-19 crises. The result of this program is provide mortgage lenders with a guaranteed way to sell their mortgage assets. Mortgage lenders like Defendant enjoyed record profits during this time and benefited greatly from this program.

claimed in their loan applications. They are the actual lender, providing the money directly to the home borrower. They are a *direct* lender, a mortgage provider. The SBA rules are clear: while almost every industry type is allowed to take PPP loans, a very few select number of industries are specifically <u>not</u> permitted, including lenders like COMMERCE. Large cash rich money lenders have financial resources readily available to pay their own payroll expenses. Their stock in trade is money. The SBA correctly excluded such companies. They should not take away money from small businesses which do not have ready access to liquid funds. Defendants' *industry type* make them ineligible for PPP loans because they are **lenders**.[6] Therefore, Defendants' certification was <u>false</u> because they **are the type of business/industry which is prohibited from SBA loans**. COMMERCE is a lender that provides money loans to consumers, for mortgages.

18.   <u>Admission of Industry: Real Estate Credit</u>. On its application, Defendant admits to its business function as a *lender* by reporting its industry type as being "Real Estate Credit", in other words, lending money to buy real estate. COMMERCE proudly states on its website that is a "state-licensed mortgage lender". Despite all this, the company falsely reported to the SBA that it was permitted to take the loans even though the SBA has clear rules prohibiting loans to finance companies and lenders.

19.   <u>Falsified Number of Jobs Reported</u>. In its loan applications, COMMERCE with its affiliate The Capital Corporation deceptively claimed to have fewer than 500 jobs. It is a fabricated round number which was falsely reported to the government by Defendants in order to get below the 500 employee threshold in order to qualify for the loans. The number of jobs The Capital Corporation reportedly has is 216. COMMERCE is reported to have 473 jobs. This brings their total to at least 679. Defendants are not a "small business" but rather a

---

[6] COMMERCE is a direct lender, mortgages specifically. They specialize in home mortgage loans and have Lender Licenses in many states.

COMPLAINT

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

large one. It is a large conglomerate, which was certainly not suffering financially to the point that it could not pay its workers.

20.    <u>Defendants Clearly Knew the Loan Applications were False</u>. Defendants falsified their eligible business expenses on their loan application as well as the forgiveness application. ADAMS is a sophisticated businessman. COMMERCE is a sophisticated company with extensive history in the lending industry. They knew full well lenders and venture capital companies are not eligible to receive SBA 7(a) loans or PPP loans, nor were they eligible for loan forgiveness. Defendants intentionally ripped off a government aid program needed by working families to survive.

21.    <u>Payroll Cap Violated</u>. The PPP assistance is not supposed to be used for partner draws or distributions. It was not supposed to be used to pay for lavish salaries for executives. It is evident here that the $100,000 per employee cap was violated by Defendants *given the large amount of the loan and the relatively small number of jobs reported.* The amount of the loan was beyond the authorized payroll limits, given the limited number of jobs reported. Defendant's use of the loan money violated the $100K Salary Expense Cap (as defined below) which was confirmed in the applications. It was promised that 100% of loan proceeds would be used for salaries. Based on the relatively small number of jobs reported, the amount of the loan was beyond the government instruction <u>not to exceed</u> the $100,000 salary cap per person.

22.    <u>Money Not Returned</u>. The loan was taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. The **$7,945,500.00** in aid funds should have been returned immediately. These loans should never have been sought in the first place.

23.    <u>Further Falsification on Loan Forgiveness</u>. Defendants falsified further documents in order to receive loan forgiveness, foisting the costs on the American taxpayer while depriving small businesses and their employees of funding to stay

open and keep working. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They lied on these documents and application also in order to receive forgiveness.

24.     Defendants' False Statements and Fraud. Defendants knowingly and intentionally made many material false statements to the government and bank to obtain the loans.

25.     Defendants did in fact receive the loans. *The Defendants have not returned the loan money.*

26.     Defendants used the loans for unauthorized purposes.

27.     Defendants sought and obtained loan forgiveness. They could not have complied with the requirements of forgiveness given their business type, assuming the CEOs and executives did not simply pocket the money.

28.     Defendants' communication of false statements constitutes Wire Fraud pursuant to 18 U.S.C. Section 1343, which occurred when Defendants used "the wires" (this includes using the internet or the phone) to steal money by making false statements or promises.

29.     Defendants' communication of false statements also constitutes Bank Fraud (18 U.S.C. Section 1344) – by making false statements to a bank or other financial institution.

30.     Defendants communicated in writing, deceptive statements, including without limitation, with respect to the eligibility of the company obtaining the loans, economic necessity of the loan, the intended purpose of the loan, and the actual use of the proceeds, among others.

31.     Plaintiff-Relator, Relator LLC on behalf of the United States of America brings this action to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law and equitable theories of unjust enrichment and payment by mistake.

32.     This action arises from numerous false statements and claims that the Defendant knowingly presented to the United States and the United States Small Business Administration ("SBA") and lenders acting on the SBA's behalf, in violation of the FCA and common law.

33.     The Defendants unlawfully obtained millions of dollars of PPP Proceeds (as defined below), and failed to return or repay the money. In fact, they went further and obtained total loan forgiveness. The US taxpayer unfairly subsidized their highly profitable businesses, while deserving small businesses found they could no longer get loans. Businesses like COMMERCE and CAPITAL drained the program.

34.     In summary, Defendants used the pandemic to swindle millions of dollars from the government. They deceptively completed the SBA loan applications by seeking money for businesses which they knew are INELIGIBLE to receive even 1 dollar of PPP loans. The industries in which Defendants belong are expressly *prohibited* from receiving SBA loans. Defendants did not need the loans. They had oceans of cash reservoirs on hand to pay their small payroll, more than enough to pay their workers. Defendants' stock in trade is money. They are in the business of providing loans themselves. Both the mortgage company and the investment bank provide loans. Business was booming when they applied in 2020. Not only were the loans impermissible, but they obtained forgiveness. The loans were only made because the government and SBA relied on the many false statements made by Defendants. Defendants knew full well that they were making many false statements to the government and SBA. They knew full well that their active pursuit in seeking out this money was illegal, but they persisted and kept the money.

## V.    THE PARTIES

35.     Plaintiff Relator LLC, is a California limited liability company with its principal place of business in Los Angeles, California.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

36.     Defendant Change Lending, LLC is a California limited liability company formed on April 4, 2018 with its principal place of 16845 Von Karman Avenue, Suite 200, Irvine, CA 92606.

37.     Defendant Daniel Adams is an individual and, at all relevant times herein, is and was the Chief Executive Officer, director of The Capital Corporation.

38.     Defendant The Capital Corporation is a South Carolina limited liability company, formed in 1991 with its principal place of 84 Villa Drive Greenville, SC 29615.

39.     Defendant Scott Simonich is an individual and, at all relevant times herein, is and was the Chief Executive Officer, director of Commerce Home Mortgage, LLC. Commerce Home Mortgage changed its name to Change Mortgage in 2017. Scott Simonich is also the CEO of Change Lending, LLC.

40.     Defendant Commerce Home Mortgage LLC is a California limited liability company, formed on January 1, 1993 with its principal place of 16845 Von Karman Avenue, Suite 200, Irvine, CA 92606.

41.     COMMERCE is a mortgage lender which directly provides cash loans to people in return for an ownership interest in their homes.

42.     CAPITAL is an investment banking company focusing on mergers and acquisitions of lower middle market companies across a broad range of industries.

43.     During round 1 of the paycheck protection program, Defendant COMMERCE applied for a PPP loan for **$7,945,500.00.** It was approved on April 3, 2020 by the SBA for the full amount, which was disbursed. The loan was facilitated by Cornerstone Community Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 250 employees for which it needed the loan.

## VI.     The CARES Act and Paycheck Protection Program

44.     On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and

provided emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

45.     The CARES Act authorized loans to eligible small businesses struggling to pay employees and other business expenses as a result of the devastating effect of the COVID-19 pandemic.

46.     Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program" ("PPP").

47.     On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) became law and provided additional funding and authority for the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) became law and changed key provisions of the Paycheck Protection Program, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

48.     Under the PPP, in 2020, eligible businesses could obtain one SBA guaranteed PPP loan. Businesses were required to spend loan proceeds for employee compensation, rent or mortgage, and other specified expenses and, depending on their use of the loan proceeds, could qualify for loan forgiveness, up to the full amount of the loan.

49.     The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, a qualifying business (through its authorized representative) signed and submitted a PPP loan application (SBA Form 2483) online through the lender's application platform. The PPP loan application (SBA Form 2483) required the business (through its authorized

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

representative) to acknowledge the PPP program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

50.    Once the Borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the participating lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

51.    After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer Yes to the following questions in the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to receive a PPP Loan:

| | | |
|---|---|---|
| • The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the | ☐ Yes | ☐ No |

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

| | Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | | |
|---|---|---|---|

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

52.    SBA Form 2483 provides the following certification, among others "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them" (hereafter the "Understanding Certification").

53.    SBA Form 2483 provides the following certification, among others "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (hereafter the "Eligibility Certification").

54.    SBA Form 2483 provides the following certification, among others "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (hereafter the "Use of Proceeds Certification")

55.    SBA Form 2483 additionally provides the following certification, among others: "Current economic uncertainty makes this loan request necessary to

C Y P R E S S   L L P
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

support the ongoing operations of the Applicant" (hereafter the "Economic Necessity Certification").

56.    SBA Form 2483 additionally provides the following certification, among others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (hereafter the "Worker Retention and Payroll Certification.")

57.    SBA Form 2483 additionally provides the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (hereafter the "Single Loan Certification.")

58.    SBA Form 2483 additionally provides the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (hereafter the "No False Statements Certification").

59.    After the borrower submitted the PPP loan application, that application was then processed by a participating lender. If a PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event that the borrower

1  defaulted on a PPP loan, the SBA would purchase the borrower's debt from the

2  lending financial institution and take on the responsibility for paying back the loan.

3        60.    Under the applicable PPP rules and guidance, recipients of PPP loans

4  could apply to have the interest and principal on the PPP loan fully forgiven,

5  meaning that the borrower would owe nothing and would have no obligation to

6  repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to

7  attest that they had "not reduced the number of employees or the average paid hours

8  of [their] employees" during the loan period, that the loan proceeds had been spent

9  on payroll costs and other permitted expenses and that at least 60% of the loan

10  proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness

11  Certification").

12        61.    Loans could only be used for certain permitted expenses, such as to

13  fund payroll costs and employee benefits, such as health insurance, to pay for,

14  mortgage interest, rent, utilities or worker protection costs related to COVID19.

15        62.    13 CFR§ 120.110 provides a list of what type of business are

16  INELIGIBLE for SBA loans. This list includes lenders like Defendant …

17        **"(b) Financial businesses primarily engaged in the business of lending,**

18        **such as banks, finance companies, and factors (pawn shops, although**

19        **engaged in lending, may qualify in some circumstances)"**

20        63.    On April 2, 2020, the SBA posted the First PPP Interim Final Rule

21  announcing the implementation of the CARES Act. SBA posted additional interim

22  final rules on April 3, 2020, and April 14, 2020. On April 28, 2020, SBA posted an

23  interim final rule supplementing the previously posted interim final rules with

24  additional guidance. See, Federal Register / Vol. 85, No. 82 / Tuesday, April 28,

25  2020 / Rules and Regulations at, 23450-52, available at

26  https://home.treasury.gov/system/files/136/Interim-Final-Rule-on-Requirements-

27  for-Promissory-Notes-Authorizations-Affiliation-and-Eligibility.COMMERCE.

28  This interim final rule supplemented previous regulations and guidance on several

important, discrete issues. The April 28, 2020, Interim Final Rule was immediately effective without advance notice and public comment because section 1114 of the CARES Act authorized SBA to issue regulations to implement Title I of the CARES Act without regard to notice requirements. *Id.*

64. With respect to the PPP, the January 6, 2021, Interim Final Rule provided Clarification Regarding Eligible Businesses, specifically 13 CFR Parts 113, 120 and 121.

> *"Are businesses that are generally ineligible for 7(a) loans under 13 CFR 120.110 eligible for a PPP loan?*
>
> **Paragraphs (a), (g), and (k), of 13 C.F.R. 120.110 do not apply to PPP loans. For PPP loans, the ineligibility restriction in 13 C.F.R. 120.110(n) is superseded by subsection B.2.a.iii. of this interim final rule. Otherwise, a business is not eligible for a PPP loan if it is a type of business concern (or would be, if the entity were a business concern) described in 13 C.F.R. 120.110, except as permitted by subsections B.1.d and B.1.g of this rule or otherwise permitted by PPP rules. Businesses that are not generally eligible for a 7(a) loan under 13 C.F.R. 120.110 are described further in SBA's Standard Operating Procedure (SOP) 50 10 6, Part 2, Section A, Chapter**

65. The SBA's Standard Operating Procedure (SOP) 50 10 6, Part 2, Section A, Chapter states as follows:

/ / /

/ / /

/ / /

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

## CHAPTER 3: INELIGIBLE BUSINESSES

### A. TYPES OF INELIGIBLE BUSINESSES

The SBA Lender must determine whether the Applicant is one of the types of businesses listed as ineligible in SBA regulations (13 CFR § 120.110). Certain business types appearing on this list may be eligible under limited circumstances, as discussed below.

1. Businesses organized as non-profit businesses are ineligible (for-profit subsidiaries may be eligible). 13 CFR § 120.110 (a)

2. Businesses Engaged in Lending 13 CFR § 120.110 (b).

   a. SBA cannot guarantee a loan that provides funds to businesses primarily engaged in lending, investment, or to an otherwise eligible business engaged in financing, factoring, or investment not related or essential to the business. This prohibits SBA Loans to:

      i. Banks;

      ii. Life Insurance Companies (but not independent agents);

      iii. Finance Companies;

      iv. Factoring Companies;

      v. Investment Companies;

      vi. Bail Bond Companies; and

      vii. Other businesses whose stock in trade is money.

   b. The limited circumstances under which certain businesses engaged in lending may be eligible are as follows:

      i. A pawn shop that provides financing is eligible if more than 50% of its revenue for the previous year was from the sale of merchandise rather than from interest on loans.

      ii. A business that provides financing in the regular course of its business (such as a business that finances credit sales) is eligible, provided less than 50% of its revenue is from financing its sales.

      iii. A mortgage servicing company that disburses loans and sells them within 14 calendar days of loan closing is eligible. Mortgage companies primarily engaged in the business of servicing loans are eligible. Mortgage companies that make loans and hold them in their portfolio are not eligible.

      iv. A check cashing business is eligible if it receives more than 50% of its revenue from the service of cashing checks.

Effective October 1, 2020                                                                 Page 141

66.     COMMERCE is a lender. They admit to being a <u>direct lender</u> in fact. They are expressly prohibited from receiving SBA loans, including PPP loans. COMMERCE's CEO, WILLIAMS is a sophisticated businessman and is not new to the lending world. He knew about the restrictions, full well. The legal and

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

financial experts he has hired over the years, would have known this. He intentionally broke these clear rules knowing full well what he was doing.

67.    Defendant's certification was false because **they are the type of business/industry which is prohibited from SBA loans**: **The Defendants are lenders**.

68.    In addition to applying any applicable business type ineligibility rules, all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483) stating that ''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''

69.    While some opportunistic fraudsters were lone charlatans making up businesses or bands of hucksters, the CEO fraudster is the most dangerous and harmful to the public. Some of these unscrupulous businesses used their advanced knowledge of business and considerable professional acumen to great effectiveness, to maximize fraud, far beyond the abilities of the average fraudster. The problems of CEO and corporate fraud are more detrimental to the PPP than has been made public. Part of the reason is that they did more damage, but were able to conceal it better.

70.    COMMERCE is an obviously successful money lending business. CAPITAL is also a successful and highly profitable investment bank. They took advantage of every aspect of the PPP program, from faking economic uncertainty to willfully ignoring prohibitions on their industry, to breaking the $100,000 salary cap, to maximizing the amount of the loan and then loan forgiveness. The CEOs are seasoned and cunning businessmen, well versed in the laws regulating the lending industry. Discovery will reveal where the millions in PPP funds were actually spent, but what is obvious is that Defendants *did not need any money from US taxpayers*. The business was lending other people money. Public sources report that COMMERCE is and was highly profitable, during the pandemic, just like most in

their industry. COMMERCE did not suffer any business loss and certainly had the money to pay their own worker wages. Their "stock in trade" is money and business was booming. Defendants simply ripped off the PPP program and had the US taxpayers subsidize their lending business, at best, or to subsidize the CEOs luxury lifestyle, at worst.

### VII.   Defendants' False Statements and Misuse of Proceeds

71.   Defendants applied for and received the PPP Loans in the total amount of **$7,945,500.00**. In order to receive the loans, Defendants would have to have completed SBA Form 2483 entitled "Borrower Application Form". In doing so, Defendants intentionally made materially false statements with respect to the Eligibility Certification, the Use of Proceeds Certification, the Economic Necessity Certification, the Worker Retention and Payroll Certification, the No False Statements Certification and the Single Loan Certification.

72.   Defendants signed the loan applications, thereby endorsing the Understanding Certification, which means that they agreed that they understood the rules and guidelines of the PPP, including, without limitation the rules regarding use of proceeds and the certifications made.

73.   The proceeds of the PPP Loans were not and could not have been used only for authorized purposes consistent with the Paycheck Protection Program Rule, because, among other things, the Defendant was obviously not allowed to take PPP loans because of their industry type - money lenders. Therefore when Defendants made the Use of Proceeds Certification, the certification was false.

74.   The proceeds of the PPP Loans were not necessary to support the ongoing operations of COMMERCE. The company's enjoyed record high business achievements since 2020 until today. It is no secret that mortgage lenders, like the Defendants' were highly profitable during the housing market price increases and high demand in 2020 and 2021. This company had considerable financial resources to pay its own workers, assuming that is where the money was spent rather than

into the pocket of the CEO and its executives. Therefore, when Defendants made the Economic Necessity Certification, the certification was false.

75.    The PPP loan money was only allowed to be used on authorized expenses. The proceeds of the PPP Loan were not permitted to be used to pay business costs for a business in the lending industry, therefore when Defendant made the Worker Retention and Payroll Certification, the certification was false.

76.    The Defendants actively pursued and obtained loan forgiveness. As a mortgage lender, COMMERCE is prohibited from obtaining any PPP loans, therefore any expenditures using PPP loan money was not authorized. In their forgiveness application, Defendant's falsely reported that they spent 100% of the loan proceeds on <u>eligible</u> expenses. Therefore, they lied on this application and certification statements to obtain this forgiveness.

77.    On their loan applications, Defendant intentionally made many key statements which were obviously false and intended to deceive. These key false statements by Defendant made it possible for them to get the loans and get them written off with forgiveness.

78.    By virtue of the above false statements, when Defendants made the No False Statements Certification, that certification was false.

## VIII.  THE FALSE CLAIMS ACT

79.    Plaintiff alleges that, from at least April 30, 2020, through the time of the filing of this Complaint, Defendants violated the FCA by "knowingly" submitting and/or causing the submission of false claims for payment to lenders authorized by the SBA to process PPP loan applications in the form of PPP Applications and the resulting receipt and failure to return PPP loans. These claims for payment were false because Defendants: (1) made knowingly false statements and certifications in their PPP applications, and in certifications accompanying its receipt of federal PPP funds, that it was complying with, and would continue to comply with, applicable laws and regulations governing the award of PPP loans;

and/or (2) made, or caused to be made, false representations in loan applications that the Defendants were eligible to receive such PPP loans. Moreover, Defendants' false claims caused the bank that they used to facilitate the loan on numerous occasions submit to the SBA, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained Defendants' false statement concerning Defendants' general eligibility for the PPP loans, on which the SBA relied and paid to the lenders. The bank relied on these false statements and passed them along to the government.

80.    The False Claims Act prohibits fraudulent conduct in connection with federal programs, including the knowing submission of false claims for payment to the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may attach if the omission renders those representations misleading. 41. 31 U.S.C. § 3729(a)(1)(A) and (B) of the FCA provide that:

(1) . . . any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

    (i) is presented to an officer, employee, or agent of the United States; or

    (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

    (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

31 U.S.C. § 3729(b)(2) (2020).

81.    A person who violates the False Claims Act during the time period at issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages which the United States Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/COMMERCE/2022-09928.COMMERCE.

## IX.    PERSONAL JURISDICTION & VENUE

82.    Plaintiff The United States of America is also located in the Central District of California. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Central District of California, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.[7]

---

[7]COMMERCE operates throughout California and is headquartered in California.

COMPLAINT

83.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Central District of California.

84.     Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public disclosure unknown to Relator, it is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

## X.      FIRST CAUSE OF ACTION

## FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729.(a)(1)(A-B))

85.     Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

86.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

87.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A).

88.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

89.     Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

$25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein.

## XI.    CONCLUSION

90.    ADAMS, SIMONICH, and their companies abused the PPP. They abused the American public. But they did it with the ecumenical prowess of their sophisticated corporations. Corporate abuse of the PPP, while uncommon, has devastated the PPP's ability to help small businesses that actually need the money. The PPP was not meant as a gravy train for opportunistic CEOs. It was not meant as a way for aggressive executives to make their board happy. The PPP was meant for struggling businesses. Now that program is dry. The American people have a right to ask for reconciliation.

## **PRAYER FOR RELIEF**

WHEREFORE, *qui tam* Plaintiff Relator LLC prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3. Reasonable attorney fees, litigation expenses, and costs of suit.

/ / /

/ / /

/ / /

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: January 20, 2023                    CYPRESS LLP


                          By:    /s/ Julian Brew
                                 _____
                                 Julian Brew
                                 Attorneys for Plaintiff
                                 RELATOR LLC

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

COMPLAINT